IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WEATERN DIVISION
NO. 5:09-CV-184-H

WILLIAM DARDEN,

    Plaintiff,

v.

SAINT-GOBAIN CONTAINERS,
INC.,

    Defendant.

**ORDER**

This matter is before the court on defendant's motion for summary judgment. The plaintiff has responded, and this matter is ripe for adjudication.

### STATEMENT OF THE CASE

Plaintiff William Darden ("Darden" or "plaintiff") is a former employee of defendant Saint-Gobain Containers, Inc. ("Saint-Gobain" or "defendant"). Hired in May 2007, his employment was terminated on July 20, 2007. On November 2, 2007, plaintiff filed a charge of the discrimination with the Equal Employment Opportunity Commission ("EEOC") (See Def.'s M. Summ. J., Ex. 13 [DE #38].) On February 4, 2009, the EEOC dismissed plaintiff's charge finding no reasonable cause to

support the allegations. (Id., Ex. 14). On April 24, 2009, plaintiff filed the original complaint in this action. On July 30, 2010, plaintiff filed an amended complaint. Plaintiff alleges that the decision by defendant to terminate plaintiff's employment on July 20, 2007, was based upon his race.

## STATEMENT OF THE FACTS

Defendant operates a plant in Wilson, North Carolina that manufactures glass containers. The plant is separated into two sections known as the "hot-end" and the "cold-end." In the hot end of the plant, there are tanks that mix the materials needed to make "gobs" of molten glass. The gobs are then injected into molds to form bottles. The formed bottles are transported by conveyor belts and production lines to the cold end of the plant, where quality control checks are performed, including running the bottles through automatic inspection equipment. Bottles are then packaged for delivery to customers. The Wilson plant runs twenty-four hours a day, seven days a week. In the cold end the plant employs four different crews (A, B, C, and D). Three crews work each day. Each crew has a supervisor who reports to Cold End Manager Pat Rohde.

The process of making bottles only shuts down when molds are changed to make different types of bottles. Because the production of gobs is continuous, it is imperative that jams or

backups of bottles at any location on the production line be eliminated. If the backup is not properly managed, then the bottles that are backed up have to be "dumped" or recycled.

Plaintiff was hired by defendant into the entry level position of shop attendant on May 29, 2007. Darden was hired as a "probationary" employee, meaning he could be fired for any reason and was not protected by the union contract available to full-time employees. From October 8, 2006 to May 30, 2007, defendant had hired a total of fourteen shop attendants, ten of whom, including Darden, were African-American. Darden was assigned to work on crew D under the supervision of Tom McHale. At the time of Darden's assignment, twenty-eight of twenty-nine employees working under McHale's supervision were African-American. Crew chiefs, such as McHale, were given the right to fire employees on their crew.

Plaintiff was responsible for monitoring two different production lines to ensure the lines did not jam and to keep his area clean by sweeping up broken glass. Darden also monitored an operation called a squeezer. The squeezer presses bottles to check their strength and quality and often causes poor quality bottles to break or fall over. The squeezer is a dangerous machine in which an employee can amputate a hand or an arm if he attempts to remove a jammed bottle without de-energizing the

3

squeezer and the conveyor line. Darden was trained on the proper procedure for de-energizing the squeezer before beginning work and was assigned an experienced employee to do hands-on training during his first few days of work. During training, plaintiff was informed that any employee who put his hand near the point of operation of the squeezer without de-energizing the equipment would be guilty of a safety violation that could result in his immediate discharge.

In 2007, Mindy Davidson was employed by defendant as a "Tank Manager" at the Wilson plant and was responsible for all production issues connected with one of the two tanks in which raw materials are mixed to make molten glass. Her authority exceeded that of the crew supervisors.

On June 7, 2007, Davidson and McHale were standing on an overhead platform near Darden's work area. Davidson observed Darden putting his hand near the point of operation of a squeezer. While McHale did not observe the violation himself, Davidson advised McHale of plaintiff's safety violation. Davidson and McHale walked down to the floor of the plant, and Davidson advised Darden that he had committed a safety violation and demonstrated the proper procedures for de-energizing the equipment. Plaintiff denied that he had committed the violation. During Davidson's conversation with plaintiff, Jack

4

Baciak, a Quality Control Supervisor at the Wilson plant approached McHale and advised him that he had been walking the floor at a location that gave him a clear line of sight into plaintiff's work area and that he had also observed plaintiff put his hand near the squeezer's point of operation without shutting down the equipment.

McHale determined that plaintiff should be fired because of the safety violation. McHale asked plaintiff to come to his private office and called a union representative, Joe Brickhouse, even though Darden was a probationary employee with no right to union representation. After McHale advised Darden he was terminating him, Darden continued to deny he committed a safety violation. Upon leaving McHale's office, Darden and Brickhouse went to the office of McHale's supervisor, Cold End Manager Pat Rohde. Darden told Rohde he had not committed a safety violation and asked him to accompany him to the squeezer to allow plaintiff to show Rohde that Darden knew the proper procedures. After seeing Darden demonstrate the proper procedures, Rohde agreed to give Darden a second chance provided Darden and the union agreed to a 30-day extension of his probationary period.

Following June 7, 2007, McHale continued to observe various performance problems by plaintiff: for example, trouble

5

maintaining his concentration, failing to properly clear a problem with the case packer, failing to eliminate the causes of a jammed line on Shop 12, and failing to promptly sweep up broken glass. McHale also gave plaintiff regular oral reprimands or counseling about job deficiencies including the need to speed up his work, do a better job observing and clearing jams, and improve on housekeeping matters like sweeping up broken glass.

Shortly before the end of Darden's probationary period, on July 20, 2007, McHale called Darden and Brickhouse to his office again. McHale advised plaintiff he was terminating him because of poor job performance.

Plaintiff's response to the motion for summary judgment is difficult to follow. For example, plaintiff claims that McHale did not give him regular oral counseling following the June 7, 2007, incident. However, in the very next sentence of his memorandum, plaintiff claims that McHale "always told Darden that he need [sic] to speed up his work regardless of how well his work was and treated him with disdain and always presented a condescending taunt, even when there was no problems whatsoever[.]" (Pl.'s Mem. Resp. Summ. J. at 3 [DE #43].) Even according to plaintiff, it appears McHale was communicating to plaintiff that there were problems with plaintiff's performance.

6

Plaintiff also claims that he was treated differently than a white employee, Tim Horne. He claims that Mr. Horne had "failed in several departments" but was able to work in other departments. Plaintiff states this was an opportunity he was not given.

## COURT'S DISCUSSION

### I. Standard of Review

Summary judgment is appropriate pursuant to Fed. R. Civ. P. 56 when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).

Once the moving party has met its burden, the non-moving party may not rest on the allegations or denials in its pleading, Anderson, 477 U.S. at 248, but "must come forward with 'specific facts showing that there is a genuine issue for trial.'" Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)). As this court has stated, summary judgment is not a vehicle for the court to resolve disputed factual issues. Faircloth v.

United States, 837 F. Supp. 123, 125 (E.D.N.C. 1993). Instead, a trial court reviewing a claim at the summary judgment stage should determine whether a genuine issue exists for trial. Anderson, 477 U.S. at 249.

In making this determination, the court must view the inferences drawn from the underlying facts in the light most favorable to the non-moving party. United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) (per curiam). Only disputes between the parties over facts that might affect the outcome of the case properly preclude the entry of summary judgment. Anderson, 477 U.S. at 247-48. Accordingly, the court must examine "both the materiality and the genuineness of the alleged fact issues" in ruling on this motion. Faircloth, 837 F. Supp. at 125.

### III. Burdens of Proof

An employer charged with discrimination is entitled to summary judgment if the plaintiff fails to establish a prima facie case or fails to raise a factual dispute regarding the reasons the employer proffers for the alleged discriminatory act. See Henson v. Liggett Group, Inc., 61 F.3d 270, 274 (4th Cir. 1995). Furthermore, "the mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient; there must be evidence on which the jury could

8

Case 5:09-cv-00184-H   Document 54   Filed 08/01/11   Page 8 of 16

reasonably find for the plaintiff." Id. In Title VII cases, a plaintiff may make out a prima facie case by proffering direct evidence of discrimination or indirect evidence "whose cumulative probative force, apart from the presumption's operation, would suffice under the controlling standard to support as a reasonable probability the inference that but for the plaintiff's [protected status or activity]," the defendant would not have taken the adverse employment action. Holmes v. Bevilacqua, 794 F.2d 142, 146 (4th Cir. 1986). In the absence of such evidence, a plaintiff must resort to the McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-805 (1973), presumption framework.

Under McDonnell Douglas, a plaintiff faced with a motion for summary judgment must first establish a prima facie case of unfair treatment by a preponderance of the evidence. See St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506 (1993); Henson, 61 F.3d at 274. A prima facie case requires plaintiff to prove facts from which a nexus can be inferred between the alleged adverse action and the plaintiff's protected status or conduct. Holder v. City of Raleigh, 867 F.2d 823, 826 (4th Cir. 1989). If the plaintiff establishes a prima facie case, then an inference of discrimination arises. See Henson, 61 F.3d at 274.

9

The defendant then can offer legitimate, nondiscriminatory explanations for the allegedly discriminatory acts. See McDonnell Douglas, 411 U.S. at 802. The employer's burden is one of production, not of persuasion; therefore, the employer is not required to prove the absence of discriminatory motive. See Henson, 61 F.3d at 274-75. The plaintiff always bears the ultimate burden of persuasion. If the employer offers a legitimate, non-discriminatory reason, the plaintiff must show by a preponderance of the evidence that the defendant's explanations are merely a pretext for discrimination or otherwise are not worthy of credence. See id. at 275. It is not enough for the plaintiff to merely prove the falsity of the employer's explanations; the plaintiff must also prove his case of intentional discrimination. Reeves v. Sanderson Plumbing Products, 530 U.S. 133, 147 (2000). However, it is permissible to infer the ultimate fact of discrimination from the falsity of the employer's explanation. Id.

## IV. Analysis

To establish a prima facie case of race discrimination under Title VII, plaintiff must show: (1) he is a member of a protected class; (2) he was performing his job satisfactorily; (3) he was subjected to adverse employment action; and (4) similarly situated employees outside the protected class

10

received more favorable treatment. Hughes v. Bedsole, 48 F.3d 1376, 1383 (4th Cir. 1995); Hill v. Lockheed Martin Logistics Mgmt. Inc., 354 F.3d. 277, 285 (4th Cir. 2004).

Plaintiff, who is African-American, claims that while he was performing his job exceptionally well, he was mistreated by his supervisor and ultimately discharged. He claims that in contrast, a white employee, Tim Horne, was allowed to train in various positions and was treated more favorably than plaintiff.

Defendant argues that plaintiff was not performing his job at an acceptable level and that other employees, including Tim Horne, were not treated more favorably. In fact, defendant argues that plaintiff was actually treated more favorably than other employees because he was not immediately discharged after he was observed by two different supervisors making an egregious safety violation, but rather was given another opportunity to prove he could perform the job. Defendant notes that plaintiff admits that the safety violation he committed would have justified termination. Cold End Manager Rohde's decision to give Darden a second chance was an unprecedented action at the Wilson facility and contrary to what plaintiff was told would happen if his supervisors believed that he had violated an important safety rule.

Plaintiff argues that McHale treated him unfairly after Rohde's reversal of the discharge decision. Defendant notes, however, that McHale did not personally observe the "squeezer" incident. Instead, McHale was informed of the violation by two different supervisors. Furthermore, after plaintiff was reinstated by Rohde, McHale told Darden that he would ensure Darden would be retained at the end of his probationary period provided plaintiff could prove to McHale that plaintiff could adequately do the necessary work. (Darden Dep. at 49.) Plaintiff failed to perform adequately, as decided separately and independently by McHale, Davidson and Rohde (See McHale Decl. ¶ 9; Davidson Decl. ¶7-8.)

Plaintiff contends that other Caucasian employees received favorable treatment on the basis of race. Plaintiff points to the treatment of a probationary employee Tim Horne, contending that Horne was failing in his job performance. Plaintiff speculates that Horne was being moved to many different work areas because he was failing in the area he was in, while Darden stayed in one area, so he must have been successful. However, defendant's policy is such that once a probationary employee was proficient in one work area, he is moved to another work area so that he is cross-trained in all functions in the cold end of the plant. Defendant states that Horne was moved to multiple work

12

areas because he continued to meet company standards on all cold end functions. Plaintiff however was moved less often because he never demonstrated proficiency in his original position.

Plaintiff contends he was performing more than satisfactorily. He argues that the production lines to which he was assigned were producing bottles at higher volume than other lines. Defendant notes that the productivity of a production line is determined by many factors and cannot be the sole basis for judging plaintiff's job performance.

Plaintiff contends that McHale gave him oral warnings constantly (yelled and screamed at him) without legitimate cause. He notes that he was never written up for anything other than the alleged safety violations discussed earlier. Defendant notes that because plaintiff was a probationary employee, he was not subject to the same protections as non-probationary employees and it was not the company's regular practice to provide probationary employees with written warnings. Defendant's contract with the local union gave the company the right to discharge probationary employees for any reason, and probationary employees have no right of appeal under the union contract.

In sum, defendant notes that plaintiff was given a second chance to come back to work after engaging in a serious safety

13

violation, thus receiving more favorable treatment than Horne or other similarly situated employees.

The court finds that plaintiff has not shown a prima facie case of disparate treatment. The facts show that plaintiff was not performing his job in a satisfactory manner. Furthermore, he has not shown that persons outside the protected class were treated more favorably than he was.

Even assuming plaintiff can show a prima facie case of disparate treatment, defendant has provided a legitimate, non-discriminatory reason for termination of plaintiff's employment—continued substandard performance. The declarations of McHale, Davidson and Rohde evidence that plaintiff's poor performance was the cause of his termination. Job performance is a valid, legitimate, and nondiscriminatory reason for termination of employment. Evans v. Techs. Application & Serv. Co., 80 F.3d 954, 960 (4th Cir. 1996) (poor job performance is "widely recognized as a valid, nondiscriminatory basis for any adverse employment decision") (internal citations omitted).

Finally, plaintiff has failed to provide evidence to show that defendant's explanations are a pretext for unlawful race discrimination. Plaintiff admits he never heard McHale utter a racial epithet or make other racially charged statements. (Darden Dep. at 43-44, 168). Additionally, in July 2007,

14

thirty-one of the thirty-three employees assigned to McHale's crew were African-American. It is difficult for plaintiff to argue that he was singled out because of his race. See Bello v. Bank of America Corp., 320 F. Supp. 2d 341 n.1 (D. Md. 2004) ("the record shows indisputably that the overwhelming majority of employees in Bello's employment unit were African-American therefore, there is no basis whatsoever to believe that Bello was singled out for termination on the basis of 'race.'"). Additionally, from June 11, 2007 through November 5, 2007, defendant hired twelve entry level shop attendants, seven of whom were African-American. (Rohde Decl. ¶ 26.)[1]

The court finds that plaintiff has not shown a prima facie case of racial discrimination because the evidence shows he was not performing his job satisfactorily and other employees were not treated more favorably than he was. Additionally, defendant has come forward with legitimate, non-discriminatory reasons for his discharge—violation of safety standards and multiple job performance issues during his extended probationary period. Finally, the court finds that plaintiff has not shown that his termination was a pretext for unlawful race discrimination.

---

[1] Plaintiff notes that there are twelve recent EEOC filings by current employees claiming racial discrimination, but plaintiff has failed to show the relevancy of such filings to his case. The court notes that it appears these cases all involve one supervisor, a person different than the supervisors involved in this case.

15

## CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment is GRANTED. The clerk is directed to close this case.

This 1st day of August 2011.

Malcolm J. Howard
Senior United States District Judge

At Greenville, NC
#26